**Mary V. PRATT**

v.

**Kelley C. PHILBROOK.**

**Civil Action No. 95–30143–MAP.**

United States District Court, D. Massachusetts.

July 24, 1997.

Edward W. McIntyre, Clinton, MA, for Plaintiff.

Paul G. Pino, Clark, Balboni & Gildea, Brockton, MA, for Defendant.

### MEMORANDUM AND ORDER ON REMAND

PONSOR, District Judge.

### I. INTRODUCTION

This motor vehicle tort case was dismissed, in accordance with a warning contained in a written court order, sixty days after counsel announced it was settled. Three weeks after this sixty-day cut-off, plaintiff's counsel attempted to reopen the case, eventually arguing that his failure to forestall the dismissal resulted from excusable neglect. I refused to reopen the case, and plaintiff thereafter appealed.

On March 19, 1997 the Court of Appeals remanded the case to permit me to consider again the question whether plaintiff's counsel's failure to comply with the sixty-day order of dismissal arose from excusable neglect. Central to the First Circuit's analysis was the Supreme Court's decision in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), which "signalled a substantial degree of elasticity in the definition of 'excusable neglect.'" *Pratt v. Philbrook*, 109 F.3d 18 (1st Cir.1997).

On remand, I directed counsel to submit affidavits on issues highlighted by the First Circuit's opinion. Having now reviewed at length not only these affidavits but also several deposition transcripts and other documents, and carefully considered all the factors noted by the Supreme Court in *Pioneer* and by the First Circuit on appeal, I will decline to alter my ruling, on two grounds. First, for reasons now made clearer by counsels' recent submissions, conferral of relief based on excusable neglect on the facts of this case would fly in the face of *Pioneer*, rendering an elastic standard utterly formless. Second, even if I had the discretion under *Pioneer* and Fed.R.Civ.P. 60(b), this case does not present facts that persuade me to reopen the case.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Based on my review of the record in this case, I make the following findings of fact. Because the facts are undisputed or, where disputed, have been resolved in favor of plaintiff, an evidentiary hearing has not been necessary.

On February 23, 1995, the plaintiff Mary V. Pratt was riding as a passenger in a motor vehicle operated by her sister, Rita Dreyer, on Route 6A in Dennis, Massachusetts, when their car was struck by a van operated by the defendant Kelley Philbrook. Both Dreyer and Pratt received serious injuries and, in addition, Dreyer's car was badly damaged. For purposes of this Memorandum, the court will assume that the accident was Philbrook's fault.

Philbrook was covered by a single-limit policy issued by General Accident, carrying maximum coverage of $100,000. Dreyer had a policy of insurance with Plymouth Rock, carrying substantial underinsured coverage.

After the accident, Pratt retained the services of Attorney Edward W. McIntyre to press her claim for personal injury. McIntyre for some time also represented Dreyer. In fact, he settled Dreyer's claim for property damage—*i.e.*, the damage to her car— against her own insurer, Plymouth Rock. McIntyre Dep. at 51.

On June 16, 1995, McIntyre filed a complaint on behalf of Mary Pratt in the Hampden County Superior Court. This lawsuit

was removed to this court on July 10, 1995 on the basis of diversity. On July 18, 1995, Attorney McIntyre filed a Motion for a Speedy Trial, pointing out that the plaintiff was 87 years of age.

On August 3, 1995, confusion about representation led Chuck Creamer, an adjuster for General Accident, to write to McIntyre, among others, seeking clarification as to who was representing Pratt and who was representing Dreyer. This letter made reference to Plymouth Rock's subrogated property damage claim against General Accident arising from the February 23 incident. At some point, McIntyre confirmed he had withdrawn as counsel for Dreyer and was representing only Pratt.

Acknowledging plaintiff's motion for a speedy trial at a September 14, 1995 scheduling conference, I ordered counsel to "structure discovery so that information needed to permit early assessment of this case will be obtained on or before November 30, 1995." Pretrial Scheduling Order of September 15, 1995 (Dkt. No. 10). The court also ordered counsel to appear on December 5, 1995 (later continued to January 17, 1996), for a settlement conference. Because the General Accident policy contained a single limit, and because claims were also pending against this policy by Rita Dreyer, the court also ordered counsel for Dreyer to appear to discuss settlement.

On January 17, 1996 Attorney McIntyre representing Pratt, Attorney James Quirk representing the non-party claimant Dreyer, Attorney Paul Pino representing the defendant Philbrook and Chuck Creamer, the adjuster for General Accident, Philbrook's carrier, all appeared for a settlement conference. At that time, a claim by Pratt for personal injuries, a claim by Dreyer for personal injuries and a subrogated claim by Plymouth Rock for reimbursement of the monies it had paid to its own insured for property damage were all pending against General Accident's single-limit $100,000 policy. All counsel knew this. The property damage claim was for $5,000 or $6,000. Dep. of James T. Sullivan (co-counsel for Dreyer with Quirk) at 10. Also attending

the conference were the plaintiff Pratt, along with her daughter and her son-in-law.

At the settlement conference, the court inquired of Attorney Quirk whether his client Dreyer had reached a medical endpoint permitting discussions with regard to an overall settlement. Quirk indicated that he was still awaiting information but that he thought "it may be beneficial for us to discuss the matter today." Transcript of January 17, 1996 settlement conference at 6. The court then confirmed that the General Accident policy limit was $100,000 total. Pino, counsel for the defendant Philbrook, confirmed that his client was a self-employed carpenter without significant assets, so it was unlikely that any substantial funds beyond the $100,000 would be available to cover the various claims. *Id.* at 8.

During the course of the conference, Attorney McIntyre suggested that he and counsel for Dreyer could come to "some sort of an accommodation for the sisters" regarding the settlement. He also noted that Rita Dreyer might receive compensation for her injuries out of her own insurance policy, through its under-insurance coverage. *Id.* at 9.

Following some additional discussion, the court consulted at some length with both sides separately, in chambers and off the record. As a result of these discussions, a resolution of the case was reached whereby General Accident would pay the full $100,000 policy limit. Both attorney McIntyre, representing Pratt, and Attorney Quirk, representing Dreyer, assured the court that there would be no problem in negotiating the division of the $100,000 promptly. All participants in the settlement conference now agree, in addition, that nothing was said explicitly at any time during the conference on or off the record regarding Plymouth Rock's subrogated claim for property damage against the same policy.

Following the conferences in chambers, the court resumed the proceeding in open court. After congratulating everyone present at having reached the resolution, the court stated as follows:

I'm not going to get into the details of the settlement, which we have discussed *in camera*, but I understand that the result of

the agreement that we have just reached will be that both the Pratt and the Dreyer claims will be resolved, and that I will be notified if there are any problems.

My intent is to issue what we call a sixty-day order of dismissal, which means that the case falls off—is disposed of for purposes of my record but remains in limbo for sixty days and can be hauled back to life again if there are any problems wrapping the case up.

So you'll be getting a sixty-day order of dismissal in the mail in the next couple of days and that will be the end of the case as far as I'm concerned, but if you have any problems I'll hear from you, let me know and we can restore the case to the docket and pursue it. Thank you all very much for being here.

*Id.* at 15.

Although, in retrospect, I might have expressed myself more clearly, the import of these words is clear: the case will remain "in limbo" *for sixty days.* During that period it might be "hauled back to life again." After that, it would be over. Certainly, the court's wording does not suggest, as plaintiff now implies, that counsel would have an indefinite period of time during which to restore the case to the court's docket. Any inference of this sort would render the reference to sixty days meaningless.

Two significant events occurred the day following the court conference, January 18, 1996. First, a deputy clerk of this court issued a Settlement Order of Dismissal stating: "IT IS HEREBY ORDERED that this action be DISMISSED without costs and without prejudice to the right, upon good cause shown within sixty (60) days, to reopen the action if settlement is not consummated by the parties." Docket No. 14. (Emphasis in original). Thus, if there was any confusion with regard to the court's language on January 17, the written order of January 18, 1996 eliminated any conceivable ambiguity. The case was dismissed unless two conditions were met: (1) good cause to vacate the Order of Dismissal and (2) notice to the court of that good cause within sixty days.

On January 18, 1996 plaintiff also learned that the settlement described to the court had a glitch. Creamer, the adjuster for General Accident, informed Attorney McIntyre that, in addition to paying for the personal injuries of Dreyer and Pratt, Plymouth Rock's subrogated claim for property damages would also have to be paid out of General Accident's $100,000 policy proceeds, unless Plymouth Rock waived this claim. McIntyre was not happy at what he considered this change in General Accident's settlement position.

Although the topic was not mentioned at the settlement conference, it seems unfair to charge General Accident with unreasonableness at this stage. The claim for property damage had been flagged at various times throughout the case. If General Accident paid out the full proceeds of the insurance policy to Pratt and Dreyer without resolving the property damage issue, it would leave its insured, a carpenter of modest means, facing a possible claim by Plymouth Rock against his own personal assets for the $5,000 or $6,000 in damage to Dreyer's motor vehicle. It is understandable that General Accident was unwilling to do this.

The Court of Appeals, with the limited record before it, may have been misled on this point. This relatively minor hitch did not arise from "recalcitrance by an interested entity," 109 F.3d at 21, or "threatening noises" from a stranger to the litigation. *Id.* at 22. The property damage claim was mentioned in General Accident's July 20, 1995 response to McIntyre's 93A letter (Ex. 1 to Pino Affidavit), noted again in the letter of August 3, 1995 to all counsel and, in fact, discussed by Quirk and Creamer on January 17, 1996 just prior to the settlement conference. Quirk Dep. at 20. Although this detail may have been overlooked at the January 17 conference, Plymouth Rock's claim was not a surprise, and General Accident's position was not unreasonable.

In any event, although McIntyre was unhappy to be reminded of Plymouth Rock's claim, he informed Creamer that he would contact Plymouth Rock and Dreyer's attorney, Quirk, to work something out. McIntyre promised to get back to Creamer. Creamer Dep. at 27; McIntyre Dept. at 73.

Despite this promise, for roughly the next six weeks neither Creamer nor any representative of Philbrook or General Accident heard anything from Attorney McIntyre.

On February 27, 1996 Creamer finally wrote to McIntyre, with copies to Attorneys Quirk and Pino, trying to find out what was going on. McIntyre never answered the letter.

Attorney McIntyre claims that he called Creamer on Thursday, March 14, 1996 (four calendar days and two working days prior to the expiration of the sixty-day period), indicating that he and Quirk had agreed to divide the proceeds of the insurance policy between Pratt and Dreyer on an 85%/15% basis and that the adjuster for Plymouth Rock had stated orally either that he would "probably" waive, or that he would waive, the subrogation claim. The record is not clear. McIntyre Dep. at 83–88. According to McIntyre, Creamer then said that any waiver by Plymouth Rock would have to be in writing, to confirm that General Accident's insured would be protected from any future claim. In other words, after nearly two months there was still no firm understanding regarding Plymouth Rock's claim. McIntyre Dep. at 98.

In fact, Creamer does not even recall receiving the March 14 telephone communication from McIntyre or any communication whatsoever before March 18. Creamer Dep. at 26. Nevertheless, his concern for Philbrook, whenever and however expressed, was apparently well founded. On March 14, the same day McIntyre now claims to have called Creamer with assurances of at least a "probable" waiver, James T. Sullivan, Quirk's associate, sent a letter to McIntyre informing him that Plymouth Rock would *not* waive its claim for property damage without doing an asset evaluation of Philbrook to confirm that he lacked the personal assets to pay the subrogated claim. In this March 14, 1996 letter, Sullivan offered the reasonable suggestion that Pratt and Dreyer simply pro rate the property damage claim—*i.e.*, divide it between them proportionately—to resolve the issue. McIntyre admits he never responded to this suggestion in writing or orally. McIntyre Dep. at 90.

To put it mildly, the record discloses *no* evidence of "vigorous" or "diligent" efforts by Attorney McIntyre to tie up the loose ends of the settlement announced to the court on January 17, 1996. The sum total of his effort during this two-month period, by his own testimony, was a few short phone calls, "more than six and less than ten" of these to Plymouth Rock. McIntyre Dep. at 91–92. In fact, telephone records submitted to the court reflect that between January 18 and March 18 he placed three short telephone calls to Attorney Quirk on February 6, March 4 and March 6, 1996 and another three short calls on March 14. Not a single letter regarding any aspect of the case was ever sent by McIntyre between January 17 and March 18, 1996. McIntyre now states that he did fax one legal decision to Creamer on March 14, but he has no cover memo and no documentation of the fax, and Creamer denies receiving it. This consistent failure by McIntyre to memorialize his efforts in writing not only complicates the job of reconstructing the record now, but also reflects his lack of urgency at the time.

On March 18, 1996, the sixty-day deadline arrived and the attorneys' ability to reopen the case, for good cause shown, ended. Despite this, negotiations apparently continued. In the latter part of March and early April 1996 Attorney McIntyre became unhappy with the progress. On April 9, 1996, he wrote to the court blandly stating that "settlement has not been consummated" and that the plaintiff "prays the Court for the earliest possible trial available." No effort was made to communicate any good cause or explanation, which would have been required even if the letter had arrived within the sixty-day period. I deemed the letter a motion to vacate the settlement order of dismissal and denied it "as untimely and lacking in any showing of good cause."

On April 25, 1996 plaintiff moved for reconsideration. This court in a five-page memorandum denied the motion, concluding that reconsideration in the circumstances of this case would render the sixty-day order of dismissal "a nullity." Memo at 4. The court concluded: "The unavoidable fact is that plaintiff's counsel, without any articulable ex-

cuse, simply ignored the contents of the January 18 Order and now asks for special consideration. Sadly, this cannot be given." *Id.* at 5.

## III. DISCUSSION

As noted above, the First Circuit ultimately remanded this matter for further consideration in light of the Supreme Court's *Pioneer* case. My analysis of the issues here must therefore begin with that decision.

*Pioneer* addressed Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure, which allows a bankruptcy court to permit a late filing where the failure to comply with a deadline "was the result of excusable neglect." The facts of *Pioneer* were that on April 12, 1989 the bankruptcy petitioner filed a voluntary petition under Chapter 11. The next day, on April 13, the bankruptcy court mailed a "Notice for Meeting of Creditors," including within the notice a warning that proof of claims would have to be filed by August 3, 1989. It was apparently not common to notify counsel of a bankruptcy deadline in this way, and the warning itself was placed in an inconspicuous part of the Notice.

This Notice was received and read by the president of the respondent, Berlin, who then retained an experienced bankruptcy attorney, Richards, to represent him in pressing a claim against the bankrupt estate. Berlin asked Richards whether there was a deadline for filing claims, and Richards, having overlooked the warning, said there was not. The respondent's proofs of claim therefore did not arrive until August 23, 1989. The bankruptcy court refused the late filing, citing Eleventh Circuit precedent holding that "a party may claim 'excusable neglect' only if its 'failure to timely perform a duty was due to circumstances which were beyond [its] reasonable [c]ontrol.'" 507 U.S. 380 at 384, 113 S.Ct. 1489 at 1492, quoting *In re South Atlantic Financial Corp.*, 767 F.2d 814, 817 (11th Cir.1985), *cert. denied sub nom, Biscayne 21 Condominium, Inc. v. South Atlantic Financial Corp.*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986).

On appeal, the district court affirmed the bankruptcy court's ruling, in part, and remanded the case for further consideration by the bankruptcy judge. The district court directed the bankruptcy judge to apply certain factors, including (1) whether granting the delay would prejudice the debtor; (2) the length of the delay and its impact on efficient court administration; (3) whether the delay was beyond the reasonable control of the person whose duty was to perform; (4) whether the creditor acted in good faith and (5) whether clients should be penalized for their counsel's mistake or neglect. Applying these factors, the bankruptcy court again denied the motion to file the proof of claims late, and the district court affirmed the ruling.

The Sixth Circuit reversed, anchoring its decision on two important considerations: first, the bankruptcy court had "inappropriately penalized the [respondents] for the errors of their counsel"; and second, the notice of the bar date contained a "dramatic ambiguity" which could well have confused "[e]ven persons experienced in bankruptcy." 507 U.S. at 387, 113 S.Ct. at 1494, quoting *In re Pioneer Investment Services Co.*, 943 F.2d 673, 677–678 (6th Cir.1991).

The Supreme Court began its review of the Sixth Circuit's opinion by focusing on the notion of "neglect." Justice White observed that, given the commonly accepted meaning of this word, Courts of Appeals have "generally recognized that 'excusable neglect' may extend to inadvertent delays." *Id.* at 391–92, 113 S.Ct. at 1496. He then stated:

*Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect, it is clear that "excusable neglect" under Rule 6(b) is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant.*

*Id.* (Emphasis supplied).

Justice White noted, " 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is contributable to negligence." *Id.* at 394, 113 S.Ct. at 1497.

The Court then turned to the question: when is neglect "excusable"? Certain factors, the Court noted, should be considered

on this issue, including: prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay including whether it was in the reasonable control of the movant, and whether the movant acted in good faith. Applying these factors, Justice White emphasized three crucial aspects of the case before the Court: first, the lack of any prejudice to the debtor; second, the absence of prejudice to "the interests of efficient judicial administration," and, third, the good faith of respondents and their counsel. *Id.* at 398, 113 S.Ct. at 1499. The court then underlined a final point.

> We do ... consider significant that the notice of the bar date provided by the Bankruptcy Court in this case was outside the ordinary course in bankruptcy cases. As the Court of Appeals noted, ordinarily the bar date in a bankruptcy case should be prominently announced and accompanied by an explanation of its significance. We agree with the court that the "peculiar and inconspicuous placement of the bar date on the notice regarding any creditors['] meeting," without any indication of the significance of the bar date left a "dramatic ambiguity" in the notification.

*Id.* at 398, 113 S.Ct. at 1499–1500. (Citations omitted.)

In perhaps the most significant passage of the decision—for purposes of the current inquiry—the court noted that, even with the inadequate notice, it would not have found that the bankruptcy court abused its discretion in declining to find the neglect to be "excusable," if the record had exhibited *any* evidence of prejudice to judicial administration or *"any indication at all* of bad faith." *Id.*[1] (Emphasis supplied.)

For the reasons set forth below, permitting the resurrection of this case would have serious, damaging effects on judicial administration and would reward an attitude of indifference to the court's order on the part of plaintiff's counsel tantamount to bad faith.

Before addressing the factors set forth in *Pioneer*, two initial points must be made.

First, it is absolutely *not* the opinion of this court that excusable neglect may only arise in circumstances beyond the control of the attorney. This construction would distort the meaning of the word "neglect." One is not "neglecting" to do something when he or she is prevented from performing by superior force. Although (as Justice White noted) it is not *usually* the case, in certain circumstances inadvertence or negligence *may* be "excusable."

Second, there can be no argument in this case that the notice to counsel was "peculiar" or "inconspicuous." The First Circuit explicitly found that the notice of the sixty-day cutoff was unambiguous, and the record makes this clear. Plaintiff's counsel was informed orally of the deadline, and its purport was described. The very next day he was sent a written notice whose *only* topic was the sixty-day deadline. The significance of the written notice would have been plain to any person of normal intelligence, let alone to experienced counsel. Thus, a "significant" factor in *Pioneer* is not present here.

Turning to the factors described by the Supreme Court, I find that four of the five weigh against the plaintiff. I will turn first to two factors specifically noted by Justice White as being absent in the *Pioneer* case: prejudice to judicial administration and indications of bad faith.

First, a finding of excusable neglect on these facts would undermine this court's ability to carry out the mandate of the Civil Justice Reform Act by assisting in the speedy and inexpensive resolution of cases. As the First Circuit noted, trial judges have an important role in facilitating settlement under the District's Civil Justice Reform Act Plan. 109 F.3d at 20 n. 4. One of the ironies of this case is that plaintiff's counsel specifically asked for the assistance of the court in moving the case quickly, and the court responded. The court arranged for the appearance of a nonparty attorney and, with all parties' agreement, committed substantial

---

**1.** The Court held, based on well established law, that in considering the question of "excusable neglect" a court should *not* weigh whether a party should be penalized for his attorney's neglect. *Id.* at 396, 113 S.Ct. at 1499.

time to assist the mediation process personally.

If court-assisted settlement efforts are to work, the court must be confident that counsel will take seriously their announcement to the court that the case has been settled. Unlike *Pioneer*, this was not simply a situation where a standard scheduling order issued. I had been deeply involved in assisting counsel and had received confirmation that the case was indeed settled. I will state the point as simply as I can. If counsel are permitted to treat the sixty-day order in the manner plaintiff's counsel treated it here, my efforts to assist parties in settling cases will be significantly more difficult and more uncertain. Resolution of cases will take longer and cost more.

Second, the conduct of plaintiff's counsel here well exemplifies the problems that arise when an attorney assumes that the sixty-day order has no bite. The plain fact is that plaintiff's counsel was distinctly lackadaisical in his efforts at resolving what was, in fact, a relatively minor problem in the settlement process. He made a few phone calls; he wrote no letters. In the context of this process, this court finds that plaintiff's counsel's behavior was tantamount to bad faith.

Let me be clear. I do not accuse plaintiff's counsel of subjective bad faith. But an objective finding of bad faith does not require that an attorney be, in effect, consciously delighted at the prospect of flouting a court order. Certainly, plaintiff's counsel is now sincerely distressed at the direction this case has taken and equally sincere in this protestation that he never subjectively intended any disrespect to the court. At the same time, when an announcement is made that a case is settled, wrapping up the details should be very high on an attorney's priority list. Counsel's negligence in this case was, in fact, two-fold: he both overlooked or ignored the sixty-day cut-off, and he failed to make reasonable efforts during the two months given to him to tie up the case promptly.

Counsel's position is further weakened by his efforts to mislead this court and the Court of Appeals with repeated incantations about how "diligently" and "vigorously" he pursued his efforts to wrap up the settlement during the sixty-day period. The court's time-consuming review of the record reveals no such diligence or vigor. In the right circumstances, bad faith may be exhibited as much by distortion and exaggerations as by outright falsehood.

These two factors, bad faith and prejudice to judicial administration, combined with the clear notice to counsel, confirm that the *Pioneer* decision, far from supporting the plaintiff here, actually requires a finding that there was no "excusable neglect." Whatever else the rule may permit, it does not, as Justice White noted, justify a party in "freely ignoring court-ordered deadlines in the hopes of winning a permissive reprieve. . . ." *Id.* at 395, 113 S.Ct. at 1498.

A third factor also cuts against the plaintiff. The court finds that reasonably diligent efforts on counsel's part would have resulted in elimination of all the loose ends delaying the settlement within the sixty-day period. Thus, the delay was not beyond counsel's reasonable control.

Similarly, the distance by which plaintiff's counsel missed the deadline—the length of the delay—also works somewhat against him. This is not a case where the attorney merely overlooked the cut-off by a day or two, or where a holiday intervened to complicate the calculations, or even where personal or professional crises distracted counsel. The deadline was missed by a wide margin and with no excuse.

The rather neutral effect of the only remaining factor, prejudice to the defendant, cannot rescue the plaintiff. It is true there is no evidence of unusual prejudice in this case—a loss of evidence, the death of a witness or the like. Defendant merely suffers the normal prejudice inherent when a case that was resolved returns to life. I have carefully considered this factor as favoring the plaintiff but have concluded that the other considerations detailed above predominate.

## IV. CONCLUSION

For the foregoing reasons, the court, upon reconsideration will decline to alter its origi-

nal ruling. The Judgment of Dismissal will stand.